## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **GADI BRAUDE** <br> **7601 Bathurst Street, Apt. 706** <br> **Thornhill, ON L4J 4H5** <br> **Canada** <br><br> Petitioner, <br><br> v. <br><br> **DORONA MIA ZIERLER** <br> **27 Morris Drive** <br> **South Fallsburg, NY 12779** <br><br> Respondent. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * | <br><br><br><br><br> Civil No.: |

* * * * * * * * * * * * *

### <u>VERIFIED PETITION FOR RETURN OF CHILDREN TO CANADA</u>

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

Petitioner, Gadi Braude (the "Father"), by and through his undersigned counsel, files this Verified Petition for Return of Children to Canada (hereinafter the "Petition"), against the Respondent, Dorona Mia Zierler (the "Mother").

### INTRODUCTION

1. The Petition is filed as a result of the Mother's removal of the parties' children, NBB (male; born in 2017) and AMAB (male; born in 2021) (collectively the "children"), from their habitual residence of Canada to the United States.

2. The removal took place on December 29, 2021.

1

3. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

4. The Convention came into effect in the United States of America on July 1, 1988, and was ratified between the United States of America and Canada on July 1, 1988.[3]

5. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

6. This Court has jurisdiction under ICARA § 9003 because this case involves the removal of children under the age of 16 to the United States from their habitual residence of Canada.

7. The children are currently located within the jurisdiction of this Court. The children are staying with the Mother in Sullivan County at 27 Morris Drive, South Fallsburg, NY 12779. This residence is the residence of the Mother's parents, Rabbi Lawrence Zierler and Bernice Zierler.

---

[1] T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,494-01 (Mar. 12, 1986), text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed May 3, 2022).
[2] 22 U.S.C. 9001 *et seq.*
[3] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov/content/childabduction/en/country/hague-party-countries.html (last accessed May 3, 2022).

**FACTS**

8. The Father is a Canadian citizen.

9. The Mother is a dual Canadian and United States citizen.

10. The parties met in Canada in 2009, and began dating in 2012.

11. The parties married in Canada in July 2014.

12. After their wedding in Canada, the parties moved into a home together in Toronto, Canada to begin their married life together.

13. The Mother became pregnant with the parties' older son in or about March 2017. The Mother received all of her prenatal care in Canada through Canada's universal socialized health care system.

14. The parties' older son, NBB, was born in Toronto, Canada in 2017.

15. NBB is a Canadian citizen.

16. After NBB's birth, the Mother, Father, and NBB lived together as a family in the parties' home in Toronto.

17. NBB soon became fully immersed into Canadian family life, and social life, and started attending synagogue.

18. NBB's paternal grandparents, cousins, extended family, and friends all live in Canada.

19. NBB attends family events with extended family in Canada, and he attends playdates with friends in Canada.

20. NBB has a pediatrician in Canada. He receives all of his medical care in Canada.

21. When NBB reached preschool age (18 months in Canada), the parties enrolled him in the Jewish Montessori School preschool program. He was enrolled and was attending the Jewish Montessori School at the time the Mother removed NBB from Canada in December 2021.

22. NBB has a private speech therapist in Canada. The parties decided together that NBB would benefit from speech therapy. NBB attends twice-weekly sessions with his speech therapist. NBB attended four sessions with his speech therapist from December 22, 2021 until the Mother removed the child from Canada on December 29, 2021.

23. Throughout the parties' marriage, they have had a turbulent relationship at times. From time to time, the parties have raised their voices at one another, and have used derogatory language towards one another.

24. In December 2019, during the course of the parties having a verbal disagreement, the Father threw the Mother's cell phone at a wall.

25. In March 2020, the Father tied a string around his own neck and expressed suicidal ideation to the Mother.

26. Soon thereafter, the Father was diagnosed with borderline personality disorder and began treatment with a clinician.

27. In or about August 2020, the Mother became pregnant with the parties' younger son, AMAB. The Mother again received all of her prenatal care in Canada.

28. On October 14, 2020, the Father was arrested and charged with accessing and possessing child pornography pursuant to Criminal Code, R.S.C. 1985, c C-46, s 163.1(4)(Can.), and Criminal Code, R.S.C. 1985, c C-46, s 163.1(4.1)(Can.).

29. The Father was processed and released on October 14, 2020. The Crown consented to the Father's release on the same day as his arrest. The Mother undertook that day to be the Father's surety.

30. At the same time, Jewish Family & Child Services ("JFCS") intervened in the family and required the children to be under the supervision of the Father's parents, Cyril Howard Braude and Berenice Braude (the "Paternal Grandparents").

31. On October 16, 2020, the parties and the children began living full-time with the Paternal Grandparents in Thornhill, Ontario, Canada.

32. The parties and the children lived with the Paternal Grandparents until June 2021.

33. On or about June 3, 2021 JFCS permitted the parties and the children to return to live as a family in their own apartment in Toronto (the "apartment"). The parties and children returned to live in their own apartment on June 9, 2021.

34. The parties and the children continued to reside as a family in their apartment until December 29, 2021, on which day the Mother removed the children from Canada to the United States.

35. The Father's criminal case in Canada is pending in the Ontario Court of Justice. The pretrial conference in the criminal case is scheduled for May 13, 2022. The Father is not permitted to travel outside Canada under the conditions of his release.

36. The parties' younger son, AMAB, was born in Canada in May 2021, during the time that the parties and NBB were living with the Paternal Grandparents.

37. AMAB is a Canadian citizen.

38. After AMAB's birth, the parties and both children continued to live at the Paternal Grandparents' home until the family moved back to their apartment in June 2021.

39. Like his brother, AMAB began to become part of Canadian family life and social life.

40. AMAB's paternal grandparents, cousins, extended family, and friends all live in Canada.

41. AMAB attends family events with extended family in Canada.

42. AMAB has a pediatrician in Canada. He receives all of his medical care in Canada.

43. The children are and always have been fully involved and immersed in day-to-day family life and cultural life in Canada in ways that are appropriate for their respective ages.

44. The children have never lived anywhere other than Canada.

45. On December 27, 2021, the Mother's father, Rabbi Lawrence Zierler, and the Mother's sister, Sarah Zierler, came to visit the parties and children in Canada.

46. On December 28, 2021, the Mother confronted the Father with her plan to relay to her friend Larissa Dubro that the Father is subject to a pending criminal matter in Canada. The Father did not agree with this plan to reveal the criminal matter to a friend of the Mother.

47. On December 29, 2021, following, upon information and belief, a meeting with her own family, the Mother returned to the apartment and began packing the children's belongings into suitcases. Another friend, Rae Szereszewski, came to the apartment with the Mother. The Father was in the apartment when the Mother and Ms. Szereszewski arrived.

48. While the Mother was packing the suitcases, the Father overheard Ms. Szereszewski calling the Canadian police, claiming that the Father was suicidal.

49. The Father was not suicidal.

50. Paramedics and police then arrived at the apartment. The Father told the paramedics he was not suicidal. The Father also called his therapist. The Father's therapist advised the paramedics that she had no concerns about the Father, nor that he would harm himself in any way.

51. Nevertheless, based upon the Father's prior history of suicidal ideation, the police insisted that they transport the Father to a local Canadian hospital.

52. The Father had expressed feelings of depression and suicidal ideation to the Mother approximately 10 times over the course of the year following his arrest.

53. A short time after being admitted to the emergency room at the insistence of the police, the Father was discharged by the hospital's triage department. The discharge instructions were simply that the Father was to be supported by a friend that night.

54. The Father later learned that at some point during the same day the Mother removed the children from Canada to the United States.

55. The Father learned that the Mother was in the United States through Google Locations. The parties' shared phone plan provides access for the parties to view each other's locations.

56. On December 30, 2021, the Father noticed that the Mother's phone was located at her parents' home in New York, using Google Locations.

57. For the next several weeks, the Father attempted to persuade the Mother to return the children voluntarily to Canada. She refused to do so.

58. On February 1, 2022, the Father's Canadian counsel at the time, David P. Miller, sent an email to the Mother, in which he requested that the Mother return the children to Canada. The Mother did not respond to Mr. Miller's email.

59. On February 15, 2022, the Father therefore submitted his Hague Convention Return Application (the "Hague Application") to the Canadian Delegated Central Authority, which transmitted the Hague Application to the United States Department of State, Office of Children's Issues (the "United States Central Authority").

60. On March 1, 2022, the Father's now-former Canadian counsel received an email from Cynthia Lauer, Barrister & Solicitor, who advised that she had been consulted by the Mother, and was responding on the Mother's behalf. Ms. Lauer stated that the Mother was "visiting her parents in New York State with the children" and that "[i]deally [the Mother] would like to be able to relocate with the children to New York State in order to receive help from her parents."

61. The Father then retained Canadian family law counsel, Gary Gottlieb, Barrister.

62. On March 9, 2022, Mr. Gottlieb's firm served the Mother by email, copied to her Canadian counsel, with the Father's child custody case that was to be filed the next day in the Superior Court of Justice in Ontario, Canada (the "Canadian Family Court"). Mr. Gottlieb served the Mother and her counsel in advance of initiating the Father's case, because the Father sought, *inter alia*, urgent relief in his pleadings and papers, and because such notice is required in Ontario. *See* ¶ 63 *infra*.

63. On March 10, 2022, the Father then filed his child custody case in the Superior Court of Justice in Ontario, Canada (the "Canadian Family Court"). The Father filed an initiating application seeking, *inter alia*, an order providing for the children to reside with the Father and the Paternal Grandparents, and an order for the immediate return of the children to Canada. At the same time, the Father filed an urgent motion seeking, *inter alia*, the same relief.

64. The Mother timely responded to the Father's pleadings and papers in the Canadian Family Court. She did not challenge the jurisdiction of the Canadian Family Court. She alleged

that she did not know her plans for returning to Canada when she traveled to the United States. In addition, she asked the Canadian Family Court to allow her to relocate from Canada to the United States with the children.

65. On April 7, 2022, the Canadian Family Court stayed its proceedings until resolution of this Hague Convention case.

66. The Father's Canadian family law counsel next sent an email to the Mother's Canadian counsel on April 12, 2022, in which requested that the Mother voluntarily return the children to Canada.

67. After the Mother's Canadian counsel received the email from the Father's Canadian family law counsel, the Mother filed a Family Offense Petition in the Family Court of the State of New York in Sullivan County (the "New York State Court") on April 20, 2022. In her petition, the Mother acknowledges that the Canadian Family Court case and the Father's Hague Convention application are pending.

68. On April 20, 2022, the New York State Court entered an Order to Show Cause and a Temporary Order of Protection against the Father.

69. The Father was not served with the pleadings and papers in the New York State Court case until May 2, 2022.

70. A show cause hearing is scheduled in the New York State Court for May 16, 2022.

## COUNT I – WRONGFUL REMOVAL

71. The Father restates and re-alleges the allegations contained in Paragraphs 1 through 70 as if fully set forth herein.

72. The Hague Convention applies to cases in which a child under the age of 16 years has been removed or retained from his or her habitual residence in breach of rights of custody of

a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

73. Both children are under the age of 16.

74. The habitual residence of both children is Canada and was Canada on the date the Mother removed the children from Canada on December 29, 2021.

75. The children have lived in Ontario, Canada since their respective births.

76. From the totality of the circumstances perspective as of the date of removal on December 29, 2021, Canada is the children's home and habitual residence.

77. Canada has always been the children's ordinary home and holds a degree of settled purpose from the children's perspective. The children have been fully involved and integrated in all aspects of daily and cultural life in Canada. The children have their Father, paternal grandparents, extended family and friends in Canada. The children are immersed in their religious community in Canada. The children receive medical care in Canada. The older child receives speech therapy and attends school in Canada.

78. The Father is and always has been involved in the children's family lives, religious lives, education (for the older child), and social lives from the time of each child's birth to the present. The Father has always been part of making educational, medical, religious and general welfare decisions for the children, together with the Mother.

79. At the time the Mother removed the children to the United States from Canada, the Father had (and continues to have) rights of custody to the children under Canadian law by operation of law under Ontario's Children's Law Reform Act (the "Act").

80. Pursuant to Section 7(2)(1) of the Act, there is a presumption of parentage when a father is "the birth parent's spouse at the time of the child's birth." Act, § 7(2)(1). The parties are

married, and were married at the time of the children's respective births. Both parties' parentage is therefore established by operation of law under Canadian law.

81. Section 20(1) of the Act provides that ". . . the child's parents are equally entitled to decision-making responsibility with respect to the child." *Id*. at § 20(1). Section 20(2) further provides that "[a] person entitled to decision-making responsibility with respect to a child has the rights and responsibilities of a parent in respect of the child and must exercise those rights and responsibilities in the best interests of the child." *Id*. at § 20(2).

82. The Father therefore has decision-making responsibility for the children as defined by the Act because the Father is a parent to both children, and therefore a holder of decision-making responsibility for the children under Canadian law.

83. The Father has this right by operation of law even though the Canadian Court has not yet entered any orders related to the children, and he had this right at the time the Mother removed the children from Canada.

84. Decision-making responsibility is defined under Section 18(1) of the Act as "responsibility for making significant decisions about a child's well-being, including with respect to (a) health; (b) education; (c) culture, language, religion and spirituality, and (d) significant extra-curricular activities." *Id*. at § 18(1).

85. Decision-making responsibility under Canadian law therefore necessarily involves the "care of the child" and is therefore a 'right of custody' under Article 5*a* of the Hague Convention.

86. Joint decision-making responsibilities are 'rights of custody' under Article 5*a* of the Hague Convention.

87. The Father also has a statutory *ne exeat* right for the children under Canadian law, which is a 'right of custody' under Article 5*a* of the Hague Convention.

88. In accordance with Sections 39.3(1)-(6) and 39.4(2) of the Act, a parent with joint decision-making responsibility may not relocate a child without first providing 60 days' notice to any other holder of joint decision-making responsibility of the intended relocation. Act, §§ 39.3(1)-(6), 39.4(2). The relocating parent, after providing the required statutory notice, may only relocate the children if "(a) the relocation is authorized by a court; or (b) no objection to the relocation is made in accordance with [the Act] and there is no order prohibiting the relocation." *Id*. at § 39.4(2).

89. "Relocation" is defined in Section 18(1) of the Act as "a change in residence of a child, or of a person who has decision-making responsibility . . . that is likely to have a significant impact on the child's relationship with (a) another person who has decision-making responsibility . . . with respect to the child . . ." *Id*. at § 18(1).

90. At the time of the Mother's removal of the children, the Father was actually exercising his 'rights of custody' within the meaning of Articles 3 and 5*a* of the Convention by caring for the children, fully participating in the children's lives, and undertaking all parenting responsibilities since each of the children's respective births, and/or would have been so exercising his 'rights of custody' but for the removal.

91. The Mother did not provide the Act's required statutory notice to the Father of her proposed relocation. The Father, as a joint holder of decision-making responsibility, was therefore not provided the required opportunity to object to the proposed relocation of the children. The Father would have objected if he had been provided the statutory notice.

92. The Mother's removal of the children to the United States from Canada is therefore wrongful under the Hague Convention because the Mother has removed the children from their

habitual residence of Canada, in breach of the Father's 'rights of custody' to the children under Canadian law, which the Father was exercising at the time of the retention, and/or would have been so exercising his 'rights of custody' but for the removal.

93. Notice is given in this pleading that the Father is relying upon foreign law. Fed. R. Civ. P. 44.1.

94. The Father has never consented to the removal of the children from Canada or acquiesced thereafter to the children remaining in the United States.

95. The Father has promptly taken all legal steps available to him to seek the return of the children to Canada in accordance with the Hague Convention.

96. The children are currently physically located within the Southern District of New York, with the Mother and her parents, in Sullivan County, at 27 Morris Drive, South Fallsburg, NY 12779.

## COUNT II – ARTICLE 18 RETURN

97. The Father restates and re-alleges the allegations contained in Paragraphs 1 through 96 as if fully set forth herein.

98. The Father invokes Article 18 of the Convention, which grants this Court plenary power to order the children's return at any time.

## PROPOSED AMELIORATIVE MEASURES

99. In the event that the Mother asserts the Convention's article 13*b* grave risk exception to return, and the Court determines that any such grave risk exists, the Father proposes several ameliorative measures.

100. In the Second Circuit, the consideration of ameliorative measures is currently mandatory before a district court may deny a petition for return based on an Article 13*b* grave risk

finding. *See Saada v. Golan*, 930 F.3d 533, 539 (2d Cir. 2019); *see also Saada v. Golan*, 833 F. App'x. 829 (2d Cir. 2020), *cert. granted*, *Golan v. Saada*, 142 S. Ct. 638 (Dec. 10, 2021) (No. 1034). The issue of whether consideration of ameliorative measures is mandatory is currently before the Supreme Court of the United States. *Id*. Oral argument was held on March 22, 2022 and it is anticipated that the Supreme Court's opinion will be issued before the end of the current term.

101. Unless such an approach is inconsistent with the forthcoming Supreme Court opinion on the issue of ameliorative measures, the Father proposes the following ameliorative measures, until further order of the Canadian Family Court, upon the return of the children to Canada:

    A.    The Father shall continue to receive appropriate mental health treatment at the direction of his mental health treatment providers;

    B.    The Father shall continue to comply with all conditions of release in the pending Canadian criminal matter;

    C.    The Father shall cooperate with JFCS interventions in Canada;

    D.    The Father shall continue to live with the Paternal Grandparents in Canada; and

    E.    The Paternal Grandparents are present whenever the children are in the Father's care.

## UCCJEA DECLARATION

102. The details regarding the children for the last five years that are required to be provided under New York's Uniform Child Custody Jurisdiction & Enforcement Act ("UCCJEA"), N.Y. DOM. REL. LAW § 76-h, are as follows:

      A.      The children are currently located with the Mother in Sullivan County, New York in the Southern District of New York at 27 Morris Drive, South Fallsburg, New York 12779.

      B.      From June 9, 2021 until the Mother removed the children to New York on December 29, 2021, the children lived with the Mother and Father at their apartment located at 3 New Haven Drive, Toronto, Ontario, M5N 1H8, Canada. The parties' former apartment does not have an apartment number.

      C.      From October 16, 2020 until June 9, 2021, the children lived with the Mother, Father, and Paternal Grandparents at 7601 Bathurst Street, Apt. 706, Thornhill, Ontario, L4J 4H5, Canada.

      D.      From September 2018 until October 16, 2020, NBB lived with the parties at 3 New Haven Drive, Toronto, Ontario, M5N 1H8, Canada.

      E.      From birth through September 2018, NBB lived with the parties at 23 Clanton Court, Toronto, Ontario, M3H 2W3, Canada.

      F.      The Father does not have information of any custody proceeding concerning the children pending in any other court of this or any other State, except as set forth in this Petition.

      G.      The Father does not know of any person, or institution, not a party to the proceedings, which has physical custody of the children or claims to have rights of parental responsibility or legal custody or physical custody of, or visitation or parenting time with the children, except as set forth in this Petition.

### NOTICE OF HEARING

103. Pursuant to ICARA § 9003(c), the Mother will be given notice of any hearings in accordance with New York's UCCJEA. *See* N.Y. DOM. REL. LAW § 75 *et seq*.

**ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES
PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007**

104. Pursuant to ICARA § 9007, the Father may seek an award of certain reasonable and necessary expenses and/or attorneys' fees and costs incurred as a result of the Mother's wrongful removal in the event the Court enters a return order.

**RELIEF REQUESTED**

**WHEREFORE**, Petitioner, Gadi Braude, respectfully requests the following relief:

A. That this Court issue an Order directing the prompt return of the children to their habitual residence of Canada in accordance with his 'rights of custody' under Canadian law and Articles 3, 5a and 18 of the Convention;

B. That he be awarded certain reasonable and necessary expenses and/or attorneys' fees and costs if so requested by separate timely petition or motion after entry of a return order; and

C. That this Court grant any such further relief as justice and its cause may require.

**VERIFICATION**

PURSUANT TO 28 U.S.C.A. § 1746, I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED ON MAY 3, 2022.

_____
Gadi Braude
*Petitioner*

Respectfully Submitted,

/s/ Jessica A. DuHoffmann
Jessica A. DuHoffmann
Miles & Stockbridge P.C.
100 Light Street
10th Floor
Baltimore, MD 21202

(410) 385-3782
jduhoffm@milesstockbridge.com

Stephen J. Cullen, *Pro Hac Vice Pending*
Miles & Stockbridge P.C.
1201 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20004
(202) 465-8374
(410) 385-3709 (fax)
scullen@milesstockbridge.com

*Attorneys for Petitioner*