UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
GADI BRAUDE,

Petitioner,

   -against-

DORONA MIA ZIERLER,

Civ. No. 7:22-cv-03586
Assigned to: Hon. Nelson S.
Roman

Respondent.

-------------------------------------------------------x

**RESPONDENT'S PRETRIAL BRIEF**

**I.**    **Preliminary Statement/Brief Statement of Facts**

The parties are married and have two children of their marriage, *to wit*, NBB (d/o/b: 2017) and AMAB (d/o/b: 2021). The parties had been residing in Ontario, Canada, with their children until on or about December 29, 2021, when the Respondent took the parties' children from Canada to South Fallsburg, Sullivan County, New York, where Respondent continues to reside with the subject children.

On or about May 3, 2022, the Petitioner filed a Petition (hereinafter the "Petition") in the United States District Court for the Southern District of New York, seeking the return of the parties' two (2) children, NBB and AMAB, to Canada, allegedly in accordance with Petitioner's 'rights of custody' under Canadian Law and Articles 3, 5a and 18 of the Convention. The Petition asserts that the Respondent wrongfully removed the children to the United States from their habitual residence of Canada, thus denying Petitioner the exercise of custody rights to the children.

1

In opposition to the Petition, on or about May 25, 2022, the Respondent filed an Answer (hereinafter the "Answer") which asserts several grounds and defenses/exceptions, which if established, would warrant denial of Petitioner's request for repatriation of the children to Canada.

Both the Petition and Answer contain admissions and/or allegations regarding Petitioner's criminal conduct and the pending criminal charges against the Petitioner in Canada of access to child pornography and possession of child pornography in violation of the Canadian Criminal Code (hereinafter the "Child Pornography Charges").

The Petition and Answer also raise Petitioner's unstable emotional state and his mental health issues, including his diagnosis of borderline personality disorder, his history of suicidal ideation, and at least one suicide attempt. Petitioner's criminal conduct involving Child Pornography as well as Petitioner's personality disorder and suicide issues, present grave risk of harm to the children.

In connection with the Petitioner's arrest on the Child Pornography Charges, the Criminal Release Order and bail conditions prevent Petitioner from being alone with the subject children, from possessing any device capable of accessing the internet, from possessing any image of a child under 18 or from coming within 25 metres of any school, park, community center or other place where children are likely to be unless under the continuous and direct supervision of his surety. Petitioner's surety is the Respondent.

The Answer further contains allegations regarding the history of domestic violence and coercive control perpetrated by the Petitioner against the Respondent, and which also creates grave risk of harm to the subject children.

The Answer also alleges that the relocation of the children from Canada to New York was with the consent and encouragement of the Petitioner.

In March 2022, prior to the filing of the Petition, Petitioner had commenced a divorce action against Respondent in the Superior Court of Justice in Ontario, Canada (the "Canadian Court"), seeking, among other things, a determination regarding custody of the parties' children. The Respondent appeared, participated, and submitted to the jurisdiction of the Canadian Court.

Also before the Canadian Court is the Respondent's request for relocation of the children to the United States. This request for relocation was also brought in the Canadian Court before the Petition in this Hague proceeding was filed.

As part of the Petitioner's application before the Canadian Court, the Petitioner requested an Order directing the immediate return of the children to Canada. The Canadian Court did not grant the Petitioner's aforesaid request, but instead, the Court issued an Order dated March 21, 2022, that provides for the Petitioner to have a zoom call with the children at least three times per week. This appears to be the reason that Petitioner has chosen to pursue a Hague case.

Jewish Child and Family Services ("JFCS") became involved with the parties' family as a result of the Petitioner's arrest. After Respondent moved to New York with the children, JFCS provided a "file closing letter" to both parties dated January 21, 2022, that states that JFCS is closing the file, and that because the children are residing outside of Canada, the children are no longer in need of protection since they are not having in-person visits with the Petitioner.

JFCS's January 21, 2022 letter further states that JFCS should be contacted if the children return to Toronto, that the children not have unsupervised visits with the Petitioner, and that any in-person access would need to be supervised by the Respondent or a third party who understands the risk and level of supervision required.

Therefore, based upon the terms of Petitioner's Criminal Release Order, the March 21, 2022 Order of the Canadian Court, and JFCS' directions, Petitioner is precluded from having any unsupervised access to the children, Respondent is the only adult currently approved to supervise Petitioner's access to the children, and Petitioner's access to the children is limited to three zoom calls per week.

In addition to the foregoing court proceedings, on or about April 20, 2022, Respondent filed a Family Offense Petition against the Petitioner with the Family Court of the State of New York, Sullivan County. Said Family Offense Petition sets forth some of the history of Petitioner's wrongful conduct, including but not limited to the domestic violence and coercive control perpetrated by Petitioner against Respondent.

As a result of said Family Offense Petition, a Temporary Order of Protection was issued by the Sullivan County Family Court. The most Temporary Order of Protection is dated May 16, 2022, precludes Petitioner from having any in-person contact with the children, and mirrors the March 21, 2022 Canadian Order, permitting the Petitioner to have three zoom calls per week with the children.

Of key importance is that both parties acknowledge and consent to the Canadian Court having jurisdiction to make a determination of custody and parental access of the parties' two children. Respondent has not contested the Canadian court's authority and jurisdiction to render such a child custody determination, and Respondent is not seeking to

4

have any other jurisdiction other than the Canadian court, and particularly, the courts in New York, render a determination regarding custody and access. Under the Hague Convention, the Court's first determination is limited to *WHERE* a child custody action should be tried. This issue is not in dispute herein.

Respondent will demonstrate that the Hague Convention does not apply herein, as the parties have agreed and consented to the Canadian Court's jurisdiction of the parties' custody dispute. Rather, this case involves the issue of Respondent's relocation of the parties' children to the United States, which is an issue already pending before the Canadian Court. When the Petitioner was unsuccessful in obtaining an Order from the Canadian Court compelling the children to return to Canada, he turned to the Hague Convention.

Respondent will also demonstrate that even applying the Hague Convention to this case strictly as to return of the children to Canada, the grounds and defenses/exceptions set forth in her Answer warrant denial of the relief requested in the Petition.

For example, as set forth above, the Respondent asserts that the Hague Convention does not even apply to this case, as jurisdiction for the parties' child custody determination is not disputed since both parties acknowledge and agree that custody shall be determined by the Canadian court.

The Respondent will also establish that the children were not wrongfully removed, that Petitioner was not exercising his custody rights at the time of removal and/or that the children's move to the United States is not in breach of Petitioner's rights of custody and/or that the move was with the Petitioner's consent, and that at least one defense/exception

(grave risk of danger to the children) to the Hague Convention exists, all of which warrant denial of repatriation of the children.

## II.     The Hague Convention

The primary objectives of the Convention of Civil Aspects of International Child Abduction, Done at The Hague on October 24, 1980[1] (hereinafter the "Hague Convention"), are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States. Hague Convention Art. I; *Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) ("The Convention's 'primary purpose is to restore the status quo and deter parents from crossing international borders in search of a more sympathetic court.")

Pursuant to the Hague Convention and the International Child Abduction Remedies Act[2] (hereinafter "ICARA"), the burden is on the Petitioner to prove by a preponderance of the evidence[3] that: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."[4]    ICARA § 11603(e)(1)(A).

---

[1] Convention on the Civil Aspects of International Child Abduction, October 24, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 98, reprinted in 51 Fed. Reg. 10,494 (March 26, 1986).
[2] 42 U.S.C. §§11601-11 (1998).  The United States Congress adopted ICARA in 1988, to implement the Hague Convention.
[3] 42 U.S.C. §§11603 (e)(1)(A).  ICARA imposes the preponderance of the evidence standard upon a parent seeking the return of a child under the Hague Convention.
[4] Elyashiv v. Elyashiv, 353 F. Supp. 2d 394, 402 (E.D.N.Y. 2005)(quoting Gittler v. Gittler, 396 F.3d 124 (2d Cir. 2005)).

Once a petitioner proves the foregoing, the Court must order the return of the child, unless the respondent can establish one of the affirmative defenses provided by the Convention. The applicable affirmative defense in this case is that there is a "grave risk" that the child's return would expose the child to "physical or psychological harm" or otherwise place the child in an "intolerable situation".[5]

### III.   The Court should deny the Petition because the Hague Convention does not apply in this case

The Hague Convention mandates that the Court can only determine the jurisdictional merits of the case, and that the only determination that can be rendered is *where* a child custody action should be heard and tried. The Court cannot evaluate the underlying merits of the custody dispute in connection with a case brought pursuant to the Hague Convention. Thus, a Hague Convention case is solely jurisdictional.

In this case, there is no issue or dispute regarding *where* the parties' child custody action should be heard and tried. As stated, the issues of custody and relocation are pending before the Canadian court, and Respondent has not objected same – rather, she has already participated in the custody litigation before the Canadian Court and consents to same. Therefore, it is undisputed that Respondent is not attempting to pick a different, "more sympathetic" court to make a custody determination, as she has consented to and is participating in custody litigation before the Canadian Court.

Because there is no issue or dispute regarding where the parties' custody action will be heard and tried, there is no issue before this Court that is subject to determination under

---

[5] Hague Convention, art. 13(b).

the Hague Convention, especially in light of the relocation request already pending before the Canadian Court.

In fact, the facts and circumstances demonstrate that this is a relocation case, and not a Hague Convention case, as the jurisdiction of the Canadian court to determine custody is not challenged. The issue of relocation was raised by both the Petitioner and the Respondent in the Canadian Court proceeding and is pending before the Canadian Court. Petitioner had requested the Canadian Court render an order directing the children be returned to Toronto, and Respondent filed an application requesting permission to relocate. Use of the Hague Convention to compel the return of the children to Canada is a perversion of its true purpose, and based on the facts of this case, a use of THIS Court to further the Petitioner's agenda of control and emotional violence.

The Canadian Court is aware of Respondent's relocation with the subject children to the United States, and it declined to order any immediate relief directing Respondent to return the children to Toronto.

In sum, it is submitted that one of the legal issues before this Court is whether or not this matter is, in fact, a Hague Convention case or whether the issue is Respondent's relocation with the children to New York, which would be a legal issue to be addressed and resolved as part of the parties' custody proceeding pending before the Canadian Court.

## IV.    The Court should deny the Petition because Petitioner failed to establish a prima facie case

### A.  The removal of the children was not wrongful

Respondent does not contest that the children were habitually residing in Canada prior to the time the Respondent took the children to the United States on December 29, 2021.

8

However, Respondent does contest and intends to prove that the removal of the children to the United States was not wrongful, it was not in breach of Petitioner's rights of custody, and that at the time of removal, those rights were not actually exercised by the Petitioner. These are legal issues that will be raised before this Court at trial.

Article 3 of the Hague Convention provides as follows:

The removal or the retention of a child is to be considered wrongful where-
(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
(b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Further, the facts and evidence will establish that the removal was with the Petitioner's consent.

**B.  Removal of the children did not breach Petitioner's custody rights and/or Petitioner was not actually exercising his custody rights at the time of removal**

One legal issue before this Court is whether the children's removal to the United States was in breach of the Petitioner's custody rights under Canadian law. Respondent contends and will establish that the removal did not breach Petitioner's custody rights under Canadian law.

Article 5 of the Hague Convention provides, in relevant part, as follows:

For the purpose of this Convention-
(a) "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."

In this case, Petitioner's rights of custody have been defined and restricted as a result of his criminal charges and arrest - Petitioner is not permitted to have any unsupervised

access with the children. Any access that he had on December 29, 2021 was entirely within the sole discretion, and as permitted by his supervisor, the Respondent herein. To take the position that Petitioner had any rights of decision-making defies common sense. On December 29, 2021, Petitioner was not permitted to take the children to the doctor, to the dentist, to school, to be with their friends, or to arrange playdates. Petitioner was not even permitted to use the internet so he would have been unable to be involved in things like scheduling for the children or accessing school portals. As of todays' date, the facts remain the same, even though Petitioner is not permitted access of three zoom calls per week with the children. Petitioner is still prohibited from coming within 25 meters of any school, park, community center or other place where children are likely to be unless he is under the direct supervision of his surety, the Respondent.

Both parties have submitted sworn statements from Canadian counsel addressing this issue. The respective arguments of the parties are set forth in said sworn statements and will thus only be briefly set forth herein.

In particular, Petitioner alleges that the children's removal to the United States is in breach of Petitioner's custody rights, alleging that Petitioner had and continues to have rights of custody to the children under Canadian law, pursuant to section 20(1) of the Ontario Children's Law Reform Act.

Petitioner's Canadian counsel also alleges pursuant to the above Act, Petitioner has decision-making responsibility, pursuant to section 18(1), and that such decision-making authority equates to "care of the child" and is a "right of custody" under Article 5a of the Hague Convention.

Respondent contests Petitioner's aforesaid position, asserting that there was no breach of Petitioner's custody rights. This is based upon, among other things, Section 34(1) of the Ontario Children's Law Reform Act which provides that "a Court may give such directions as it considers appropriate for the supervision, by a person, a children's aid society, or other body, of decision-making responsibility, parenting time or contact with respect to a child under a parenting order or contact order."

Also, the above-referenced court-ordered restrictions of Petitioner's access with the children is a limit of Petitioner's custody rights, as it precludes Petitioner from participating in the children's day to day lives without the supervision of Respondent. The court-ordered restrictions severely impact and limit Petitioner's ability to perform parenting duties, as any and all contact with the children must be in the presence of Respondent. And of necessity, virtually all decisions affecting the children's lives are being made by Respondent only.

Further, if, in fact, the removal was in breach of Petitioner's rights of custody as alleged by Petitioner, then the question must be asked why the Canadian Court declined to grant Petitioner's request for an Order directing Respondent to return the children to Canada. Petitioner raised this issue before the Canadian Court and the Canadian Court declined to grant such an Order, instead issuing an Order that only permits Petitioner to have three zoom calls per week with the children.

The Canadian Court's determination NOT to grant this request and issue an Order directing the return of the children to Canada supports Respondent's assertion that there has been no breach of Petitioner's custody rights by virtue of the children's removal to the United States.

11

Moreover, the children's physical residence in New York does not breach Petitioner's custody rights. As stated, Petitioner's custody rights have been defined and limited by virtue of the Criminal Release Order and the March 21, 2022 Order of the Canadian Court, which precludes Petitioner from having any unsupervised access to the children, and which only permits Petitioner to have three zoom calls per week with the children.

The children's physical presence in New York does not affect whatever custody rights Petitioner may have. Again, this is substantiated by the fact that the Canadian Court denied Petitioner's request for an immediate order directing the Respondent to return the children to Canada.

Therefore, the reality of this situation is that the children's removal to the United States does not breach any of the alleged custody rights of the Petitioner, as Petitioner's rights in connection with the children have been set by the Criminal Release Order and by the Canadian Court.

Further, even if the children are directed to be returned to Canada, as a result of the Child Pornography criminal charges Petitioner faces in Canada, there is a strong probability of Petitioner's incarceration. Pursuant to Canadian Criminal Code Section 163, the penalty for Petitioner's charges, if convicted, could result in Petitioner's incarceration for a period of time anywhere from a minimum of six months to a maximum of ten years.

## C. The Petitioner consented and gave permission to the children's removal to the United States

The Respondent will establish at trial that the Petitioner was aware of Respondent's plan to take the children to New York and that he consented to same. As corroboration of his consent, on or about December 29, 2021, after being made aware that the Petitioner was planning on taking the children to New York, the Respondent provided the Petitioner

with the oldest child's passport (the younger child does not yet have a passport) to enable the Respondent to take the children to the United States.

**V.   The Court should deny the Petition pursuant to Article 13(b) of the Hague Convention, as there is a grave risk that the children's return to Canada would expose the children to physical and psychological harm or would otherwise place the children in an intolerable situation.**

Article 13 (b) of the Hague Convention states that a Court is not bound to order the return of the child where there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.[6]

This provision recognizes that the "interest of the child in not being removed from its habitual residence ... gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation."[7]

A parent opposing the return of the children based upon this exception must prove his or her case by clear and convincing evidence.[8]

In determining what constitutes a grave risk of physical or psychological harm, the Courts have concluded that "the physical or psychological harm exception requires that the alleged harm be a great deal more than minimal. Courts will deny return of a child only when the child's danger is grave or severe and not just serious[9]."

---

[6] Id. at art 13(b).

[7] Olguin v. Santana, 2005 U.S. Dist. Lexis 408 (E.D.N.Y. 2004)(quoting Elisa Perez-Vera, Explanatory Report to the Convention P29 n13); see also Koc v. Koc, 181 F. Supp. 2d 136 (E.D.N.Y. 2002)(noting that the "Second Circuit has held that the Perez-Vera Report is an 'authoritative source' for interpreting the Convention and 'the official history' of the Convention.")(quoting Blondin v. Dubois, 238 F. 3d 153 (2d Cir. 2001)).

[8] 42 U.S.C. §§11603 (e)(2)(A).  ICARA imposes a clear and convincing standard of proof upon an Article 13(b) grave-risk exception.  However, "subsidiary facts . . . need only be proven by a preponderance of the evidence."  Danaipour v. McLarey, 183 F. Supp. 2d 311, 315 (D. Mass 2002)("there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence"), rev'd on other grounds, 286 F. 3d 1, 13 (1st Cir. 2002).

[9] In re D.D., 440 F. Supp 2d. 1283, 1298 (M.D. Fla. 2006). See also Karpenko v. Leendert, No. 09-03207, 2010 WL 831269, at *8 (E.D. Pa. Mar. 3, 2010).

In Wigley v. Hares, the Court found that "the mother's testimony about threats and abuse by the child's father provided clear and convincing evidence that return would place the child at risk of grave harm[10]."

In Blondin v. Dubois, the Court determined that a return of the children to France would present a grave risk, based upon the following:  (1) the children would suffer physical or psychological harm, as the father had repeatedly hit and threatened to kill the mother and one of the parties' two children; (2) the children were settled in their new environment in the United States; and (3) the older child expressed that she did not want to return to France.[11]  The Court additionally stated that the mother and the children would be financially dependent on the father for housing outside of the home, which was impossible as the father maintained that he had no money.[12]  Accordingly, the Court denied the repatriation of the children.[13]

The Courts have further concluded that a child's exposure to spousal abuse is relevant to the grave-risk analysis.  In Walsh v. Walsh, the First Circuit Court of Appeals held that evidence of spousal abuse alone, without evidence that violence had been directed towards the children, was enough to support Article 13(b)'s grave-risk exception.[14]  The

---

[10] Wigley v. Hares, 36 Fla. L. Weekly D1642, 2011 WL 3111898 (Fla. 4th DCA July 27, 2011).

[11] Blondin v. Dubois, 19 F. Supp. 2d 123, 127-128 (S.D.N.Y. 1998).  This case was subsequently appealed, and the Second Circuit affirmed the grave-risk assessment, but remanded for further analyses of any ameliorative measures that could be implemented to support the return of the children.  On remand, the District Court considered ameliorative measures, but again denied repatriation of the children based upon uncontroverted expert testimony that the return of the children in and of itself would constitute a grave risk as it would trigger a relapse of the children's PTSD.  On Appeal, the Circuit Court affirmed.

[12] Blondin, 19 F. Supp. 2d at 128.

[13] Id; see also Elyashiv, 353 F. Supp. 2d at 408-409 (noting that the Court denied repatriation as the return of the children would constitute a grave risk based upon: (1) their father's physical abuse of them; (2) the fact that no alternative arrangements could mitigate the grave risk to them; and (3) the uncontroverted expert testimony that the mere return of the children would trigger the children's PTSD.

[14] Walsh v. Walsh, 221 F. 3d 204,220 (1st Cir. 2000).

Court noted that the petitioner had demonstrated "a clear and long history of spousal abuse, and of threats against persons other than his wife"; that he has "an uncontrollably violent temper, and that his assaults have been bloody and severe"; and that his "temper and assaults have not in the least been lessened by the presence of his two youngest children, who have witnessed his assaults … "

The Court concluded that the District Court "inappropriately discounted the grave risk of physical and psychological harm to children in cases of spousal abuse."[15]   In connection with this, the Court noted that the social science literature indicated that "serial spouse abusers are also likely to be child abusers," and that "both state and federal law have recognized that children are at an increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser."[16]

The Court in Tsarbopolous v. Tsarbopolous, also confirmed that spousal abuse is relevant to a grave-risk assessment because of the potential the abuser will also abuse the child, as demonstrated by credible social science literature.[17]

In the instant case, there are several factors that establish there is a grave risk that the children's return to Canada would expose the children to physical and/or psychological harm or would otherwise place the children in an intolerable situation.

One such factor is the Petitioner's involvement with Child Pornography and the pending Child Pornography criminal charges against him in Canada. Such horrific conduct and behavior poses significant risk to the children, including but not limited to the fact that possession of child pornography is related to an increased risk of contact sexual offenses

---

[15] Walsh, 221 F. 3d at 220.
[16] Id. at
[17] Tsarbopolous v. Tsarbopolous, 176 F. Supp. 2d 1045, 1057-1058 (E.D. Wash. 2001).

against children, and that such charges are related to an increased risk of suicide. The Respondent will present expert testimony in support of the foregoing.

Another factor establishing grave risk to the children is the domestic violence and coercive control Respondent was subjected to by the Petitioner. Some of this conduct is set forth in the Family Offense Petition filed by Respondent with the Sullivan County Family Court. Among other things, the Petitioner was physically aggressive with the Respondent, he threw objects at her, he had fits of anger and angry outbursts at the Respondent, and he attempted to strangle himself in her presence.

In fact, Petitioner's use of the Hague Convention Petition is a vehicle for the Petitioner to continue to control, intimidate and threaten the Respondent.

Petitioner has a history of conduct which not only endangers himself and the Respondent, but which also poses a grave risk of harm for the parties' young children.

Domestic violence is a factor in many Hague Convention cases involving a parent removing the children to another jurisdiction. In the instant case, the Respondent fled with the children as part of her effort to protect herself and the children from the Petitioner's wrongful, coercive and abusive conduct. Such action by the Respondent is protective, not vindictive or manipulative.

The fact that the Respondent fled from the Petitioner in order to protect her children, by relocating to a safe haven from the Petitioner's wrongful actions, should be recognized by this Court and not punished.

Studies show that batterers use children and the court system as weapons to hurt, control or frighten their victims. Using children frequently occurs in the form of a custody or visitation litigation, where the batterer tries to use the proceedings to obtain information

about the former partner, to continue to monitor the former partner, to perpetrate additional violence, or to financially and psychologically batter the former partner into submission.

Parents who have been abused by a spouse often fear for the safety of their children. Women/mothers such as the Respondent are at risk, whether they stay with the abuser or flee. By fleeing, the Respondent is at risk that, among other things, the system will compel her to return to Canada where she will be without the funds, family support, or legal resources to effectively fight the abuser/petitioner's claims.

The legal system and the use of it in ongoing custody litigation often serves as a new battleground for the batterer's ongoing harassment of his victims. Though this is not a custody battle, this case has provided the Petitioner with a similar ability to harass and psychologically abuse the Respondent and the children.

Respectfully, this Court must understand that the Respondent fled Canada with her children for safety, and that the children would be subject to a grave risk of harm should they be returned to Canada. The Court should be vigilant in protecting the rights of the Respondent and the children in the matter before it, and to not permit the Petitioner-abuser to use this Court as a further means to control, intimidate, and threaten the Respondent.

In addition to the foregoing, another factor which poses grave risk of harm to the children is the Petitioner's unstable mental health, including his suicidal ideation and actual suicide attempt. The Petitioner has documented suicidal behavior, which behavior is proven to increase certain risks of future suicidal behavior and possible sexual abuse of minors in his care, which would necessarily include the parties' two young children.

Also, the Petitioner has a history of not consistently complying with therapy or medication requirements, further contributing to his instability and possible harmful consequences on the children.

## VI.    Ameliorative Measures would not be effective and do not need to be considered

Regarding ameliorative measures, the Courts had concluded that before a court may deny repatriation pursuant to the grave-risk exception in Article 13(b), the Court should examine whether ameliorative measures could be instituted to permit the child to return to the child's habitual residence.[18]

This would involve the Court conducting an evaluation of the placement options and legal safeguards in the country of habitual residence, so that children are protected while the courts of that country determine custody of the children.[19]

However, a Court may decline repatriation where it determines that no ameliorative measures would sufficiently decrease the grave risk to the child.[20]

In the recent Supreme Court decision, Golan v. Saada, 596 U.S. ___ (2022), the Supreme Court held that a federal court is not required to consider all possible ameliorative measures when refusing to return a child because it would put them at risk of physical or psychological abuse. This is the situation in the case at hand.

The Supreme Court in Golan v. Saada, *supra*, explained as follows: "To summarize, although nothing in the Convention prohibits a district court from considering ameliorative measures, and such consideration often may be appropriate, a district court reasonably may decline to consider ameliorative measures that have not been raised by the parties, are

---

[18] Olguin v. Santana, 2005 U.S. Dist. Lexis 408, 34 (E.D.N.Y. 2004).
[19] Walsh, 221 F. 3d at 219.
[20] Olguin, 2005 U.S. Dist. at 35.

unworkable, draw the court into determinations properly resolved in custodial proceedings, or risk overly prolonging return proceedings. The court may also fine the grave risk so unequivocal, or the potential harm so severe, that ameliorative measures would be inappropriate. Ultimately, a district court must exercise its discretion to consider ameliorative measures in a manner consistent with its general obligation to address the parties' substantive arguments and its specific obligations under the Convention."

In this case, as stated, Petitioner has engaged in repulsive and horrific criminal conduct involving young children. In particular, it is undisputed that on or about October 14, 2020, the Petitioner was arrested in Canada and was charged with possession of child pornography [section 163.1(4) CCC] and access to child pornography [section 163.1(4.1) CCC]. The Petitioner's arrest was part of a larger global police investigation known as Operation H, which originated in New Zealand.

Police officials from New Zealand said that as part of Operation H, the Digital Child Exploitation Team seized and examined hundreds of thousands of child abuse material files, that the child sexual abuse materials at the core of the investigation are some of the most "horrific abuse of children" and "most egregious" investigators have ever seen, and that "many of the children featured in the images and videos were just infants who were exposed to obvious and intentional pain and suffering." The Respondent will present expert testimony that such criminal propensities of the Petitioner involving child pornography creates a significant risk of harm to the subject children.

Also of relevance in this case is that Petitioner has a history of violating court orders, specifically, that Petitioner has violated the criminal Release Order and bail conditions, including but not limited to accessing the internet in violation of said Order.

Such wrongful and non-compliant conduct by the Petitioner supports that ameliorative measures would be ineffective.

Also, as set forth in Respondent's Answer, Petitioner has a history of spousal abuse and a history of psychological issues, including but not limited to not taking his prescribed medication or following medical advice, and suicide ideation and attempting suicide, one time in the presence of the Respondent. Such conduct by the Petitioner causes a significant risk of harm to the children.

Petitioner's history of suicidal ideations and self-harm is undisputed, as Petitioner specifically admits to said history in his Verified Complaint, which states as follows: "the Father had expressed feelings of depression and suicidal ideation to the Mother approximately 10 times over the course of the year following his arrest" ( Paragraph No. 52). Respondent will testify about text messages she received from Petitioner whereby Petitioner states he has "struggled not killing himself all day."

Moreover, any ameliorative measures would fail to protect the children.  The Respondent will testify that Petitioner violated the criminal Release Order and bail conditions on multiple occasions. The Respondent will further testify that Petitioner continued to access the internet to view pornography, unsupervised, and in violation of the bail conditions.

There are no ameliorative measures that can be implemented which would remove the likelihood that the children will suffer grave risk upon a forced return to Canada. There are no undertakings or ameliorative measures the Court can take in order to remove the grave risk to the children.

Further, it is submitted that Petitioner's suggestion regarding possible ameliorative measures is asking this Court to make determinations which would be more properly resolved in the parties' Canadian Court divorce/custody proceeding. Also, the grave risk and the potential for harm to the children in this case is so severe and unequivocal to make ameliorative measures inappropriate.

In <u>Blondin v. Dubois</u>, the District Court determined that returning the children to the children's habitual residence would subject the children to a grave risk of harm.[21]   On appeal, the Second Circuit affirmed the finding of grave risk, but remanded to the District Court to determine whether any ameliorative measures could be implemented to reduce the risk.[22]

On remand, the District Court considered the following ameliorative measures: (1) the children and mother would be eligible for social services, including government housing assistance; (2) the mother would receive free legal assistance in the pending custody proceedings; and (3) the father gave undertakings that he would assist the mother and children financially in moving back and would agree not to make contact with them prior to the judicial determination of custodial rights.[23]   However, the District Court ultimately concluded that all ameliorative measures would fail, because returning the children to the country where they were abused, in and of itself, would cause a return of their post-traumatic stress disorder.[24] The Second Circuit affirmed the District Court, and again denied repatriation.[25]

---

[21] <u>Blondin v. Dubois</u>, 19 F. Supp. 2d 123, 129 (S.D.N.Y. 1998).
[22] <u>Blondin v. Dubois</u>, 189 F.3d 240, 247-249 (2d Cir. 1999).
[23] <u>Blondin v. Dubois</u>, 78 F. Supp. 2d 283, 288-290 (S.D.N.Y. 2000).
[24] <u>Blondin</u>, 78 F. Supp. 2d at 295
[25] <u>Blondin</u>, 238 F.3d at 168.

Similarly, in <u>Elyashiv v. Elyashiv</u>, the Respondent-mother's expert psychiatrist testified that the children's return to Israel would cause a " 'full-blown relapse of their symptoms of PTSD which would be extraordinarily disorganizing' and 'they would go into very severe panic states'."[26]  The Court concluded that, as in <u>Blodin v. Dubois</u>, the issue of whether there were any living arrangements in Israel to be considered as an ameliorative measure is irrelevant based upon the sole, uncontroverted testimony of the expert that a mere return would trigger the children's PTSD.[27]

In <u>Walsh v. Walsh</u>, the Court concluded that any ameliorative measures or undertakings were completely undermined by the petitioner-father's history of violating court orders: "He has violated the orders of the courts of Massachusetts, and he has violated the orders of the courts of Ireland.  There is every reason to believe that he will violate the undertakings he made to the district court in this case and any orders from the Irish courts."[28]

In <u>Simcox v. Simcox</u>, the Court outlined three "broad categories of cases" falling under the grave risk defense and the appropriate "undertakings" (ameliorative measures) for each of these categories[29]. The first category considers cases where the abuse is "relatively minor" and "a grave risk of harm is unlikely, and undertakings will be largely irrelevant." In the second category, there is evidence of a "clearly grave risk of harm" and "undertaking will likely be insufficient." Lastly, the Court found that some cases "fall somewhere in the middle," as the abuse is "substantially more than minor, but is less obviously intolerable." In cases falling under the third category, the court should consider

---

[26] <u>Elyashiv</u>, 353 F. Supp. 2d at 402.
[27] Id. at 409.
[28] <u>Walsh</u>, 221 F.3d at 221.
[29] <u>Simcox</u>, 511 F.3d 594 (6th Cir. 2007).

a fact-intensive inquiry with a focus on (a) the nature and frequency of the abuse, (b) the likelihood of its recurrence, and (c) whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child[ren] cause by their return."[30]

Therefore, the facts and circumstances of this case demonstrate that this Court is not required to consider all possible ameliorative measures because returning the children to Canada would expose the children to a grave risk of harm.

## VII.   The Court should deny the Petitioner's request for the Respondent to pay his legal fees and costs including transportation expenses court costs

ICARA states that a Petitioner "may" be required to bear the costs of legal counsel or advisors, court costs in connection with a petition and travel costs for the return of the child.[31] Accordingly, it is not mandatory that the Court direct the Respondent to be responsible for legal fees and court costs.

ICARA further states that legal fees or court costs incurred in connection with a petition brought under section 11603 shall be paid by the Respondent unless they are covered by payments from Federal, State or local legal assistance.[32]  At this time, it is unknown whether Petitioner is in fact, paying for his own legal fees.

Lastly, ICARA "requires any court ordering the return of the child under the Hague Convention to award fees and costs to the successful party, unless such order would be 'clearly inappropriate'."[33]

It is respectfully submitted that it would be inappropriate for the court to direct the Respondent to pay the foregoing expenses, as among other things, Respondent is

---

[30] Id. At 608.
[31] 42 U.S.C. §§11607 (b)(1).
[32] 42 U.S.C. §§11607 (b)(2).
[33] Rydder v. Rydder, 49 F.3d 369 (8th Cir. 1995); 42 U.S.C. §§11607 (b)(3).

marginally employed, and she has no income or savings with which to pay these expenses.

Respondent is completely financially dependent upon her parents, as Petitioner has not paid

any child support or paid for any of the children's expenses since they have been residing

in New York. Also, as Respondent fled with the children to protect her and the children,

respectfully, it would be inappropriate to financially punish her for the foregoing.

RESPECTFULLY SUBMITTED BY:
THORSEN LAW OFFICES:


BY:_____
ERIC OLE THORSEN, ESQ. (ET-7491)
Attorney for Respondent
5 South Little Tor Road
New City, New York 10956
(845) 638-2726