**REDACTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7/29/2022__
```

GADI BRAUDE,

                          Petitioner,

          v.

DORONA MIA ZIERLER,

                          Respondent.

22 CV 03586 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Petitioner Gadi Braude ("Petitioner" or "the Father") brought this case against respondent Dorona Mia Zierler ("Respondent" or "the Mother") pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* ("ICARA") seeking the immediate return of their two sons to Canada. (ECF No. 5.)  Beginning on July 11, 2022, the Court held a three-day evidentiary hearing.  The parties then submitted post-hearing briefing. (ECF Nos. 45 & 46.)  After carefully considering the evidence, the parties' briefs, and the applicable law, Petitioner's request for relief under the Hague Convention is DENIED.

## BACKGROUND

The following facts are taken from the parties' filings, testimony provided at the evidentiary hearing, and the record.

### I.     The Family

The Mother and Father began to date in 2012 and were married on July 13, 2014.  (Ex. 9; Ex. 15 at GB000122.)  They have two children, the oldest ("Child 1") was born in 2017, and the

youngest ("Child 2") was born in 2021.  (Ex. 15 at GB000122.)  Both children were born in Ontario, Canada and resided there at all times prior to December of 2021.  (*Id*.)

The parties participated in couple's counseling with Linda Hovanessian starting in July of 2016.  (Ex. Z.)  Respondent alleges Petitioner has a history of violent behavior and coercive control, including being physically aggressive even after being asked to stop, throwing and breaking objects, having fits of explosive anger, and forbidding her from speaking to her family, friends, and therapist about him.  (Ex. 15 at GB000189.)  Specifically, Respondent recalls instances where playful wrestling would turn into physical aggression to the point where she would feel pain.  (*Id*. at GB000195; Hearing Tr. at 316:7-22; 332:17-25; 334:3-13.)  In one instance, the couple was horsing around when Petitioner bit Respondent so hard it left a bruise.  (Ex. Z.)  In another instance, Respondent informed Petitioner that she had shared information about him with her therapist, and Petitioner became angry and threw his cellphone in Respondent's direction and left the home.  (*Id*.)  Respondent also recalled a time where Petitioner pulled a necktie around her neck so tight that she started to see black and thought she was going to pass out.  (Hearing Tr. at 317:16-23.)

In regards to the children, Respondent testified that some of this behavior would occur between Petitioner and Child 1.  At times, Petitioner would play with or wrestle with Child 1 to the point where the child would cry and ask to stop, and Petitioner would ignore him.  (Hearing Tr. at 392:1–394:22.)

## II.    The Father's Mental Health History

Petitioner has been depressed since he was ten years old.  (Ex. C at GB000214.)  He has had a longstanding history of depression "characterized by chronic low energy and motivation." (*Id*. at GB000213.)  Petitioner attempted to end his life at ages ten, twelve, and thirty.  (Ex. D at

GB000220.)  At age ten Petitioner tried to jump in front of a truck, at age twelve Petitioner tried to cut himself with a knife, and at age thirty Petitioner tried to kill himself with a ribbon after a fight with Respondent.  (Ex. F. at GB000253.)  Petitioner has been diagnosed with Borderline Personality Disorder ("BPD") and "narcissistic traits." (Ex. C at GB000215; Ex. F. at GB000253.) BPD is treated with Dialectical Behavioral Therapy ("DBT"), an intensive therapy that takes years to become effective.  (Hearing Tr. at 217:2–218:19.)  Petitioner has not participated in DBT.  (*Id*. at 228:4-6.)

Petitioner was brought to the Sunnybrook Health Sciences Centere ("Sunnybrook") by police on December 23, 2019 after a fight with Respondent led her to call the police due to concern for his safety.  (Ex. C at GB000213; Ex. D at GB000216.)  Petitioner reported experiencing thoughts about wishing to be dead and general thoughts of wanting to end his life.  (Ex. D at GB000216.)  Petitioner was experiencing "a reduction in mood and suicidal ideation for 4 days" and "experienced suicidal ideation 10-11 times during that 4-day period."  (Ex. C at GB000213.) Just three days after his Sunnybrook visit, the parties were involved in a "serious argument" resulting in Petitioner throwing his cellphone in Respondent's direction.  (*Id*.; Ex. Z.)  The argument started when Respondent told Petitioner that she had shared information about him with her therapist, including that he is "verbally abusive."  (Ex. C at GB000213.)

Petitioner visited Sunnybrook again on January 10, 2020.  (Ex. C. at GB00213.)  This was the first time Petitioner was diagnosed with BPD.  (Hearing Tr. at 240:16–241:4.)  On February 13, 2020, Petitioner's primary care provider referred him to the Centre for Addiction and Mental Health ("CAMH") for treatment in their BPD clinic so that he could start DBT.  (Ex. H at GB000262; Hearing Tr. at 241:16–242:11.)

On April 2, 2020, Petitioner attempted to commit suicide by trying to strangle himself in front of Respondent. (Ex. I at GB000266.) Child 1 was asleep in the home at this time. (Hearing Tr. at 361:23-24.) Petitioner was hospitalized for five days. (Ex. I at GB000266.) While hospitalized, Petitioner was assessed and diagnosed with "Major Depression and Narcissistic personality traits." (*Id.* at GB000268.) The hospital offered a three-month psychiatric follow up and couple's counseling, and recommended DBT. (*Id.*) Petitioner was not willing to take medication. (Ex. Z.) On April 22, 2020, his primary care provider referred him to CAMH for treatment recommendations to address his "[l]ong standing [history] of mental health issues." (Ex. I at GB000266.) On July 2, 2020, Petitioner's primary care provider again referred him to CAMH for DBT to address his "[l]ong standing periods of low mood and emotional distress" and "borderline traits." (Ex. G at GB000257.)

### III.   The Father's Arrest[1]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[1] The parties received a letter dated July 7, 2022 from the Ministry of the Attorney General in Ontario stating that as Petitioner's criminal case is ongoing, it "is limited in what information it can provide in order to preserve the integrity of the ongoing prosecution, the fair trial rights of the accused and to protect against any witness tainting." (Ex. V.) Therefore, it declined to provide a copy of the statement Petitioner provided to police at the time of his arrest as well as the child pornography evidence collected in the course of the investigation. (*Id.*)

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Petitioner was arrested on October 14, 2020 for possession of child pornography.  (Ex. 15 at GB000123.) ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████  On October 27, 2020, Petitioner was charged with possession of child pornography and access of child pornography.  (Ex. 15 at GB000123.)  Petitioner was released after his arrest with certain conditions, including that he "not [] be alone with anyone under the age of 18 years UNLESS it is [his] biological son and [he has] obtained written permission from Jewish Family and Child Service ("JFCS") in advance."  (Ex. 12 at GB000031.) Respondent was his original surety.  (Ex. 15 at GB000123.)  On October 14, 2020, the family moved in with Petitioner's parents.  (*Id*. at GB000122.)

In October of 2020, Petitioner reported feeling suicidal to Hovanessian, and stated that "every consecutive [suicide] attempt is going to get more dangerous."  (Ex. Z.)  On November 10, 2020, Petitioner admitted to Hovanessian that he "had watched child pornography" and that he "watched from the perspective of the one being abused or humiliated."  (*Id*.)  In November of 2020, Petitioner began meeting with Benita Joy, a therapist from the Toronto Relationship Counselling Clinic who had experience working with sex offenders.  (*Id*.)  He saw her every two weeks for about two or three months.  (Hearing Tr. at 244:1-18.)  He terminated this treatment after his attorney and another therapist told him it would not help with his criminal case.  (*Id*. at 247:16–248:10.)  He then began treatment with another therapist every two weeks for approximately two months.  (*Id*. at 244:25–245:12.)

Further, during this time, the couple repeatedly discussed the possibility of Respondent taking the two children and going to live in New York with her parents.  (Ex. 15 at GB000194.) On December 10, 2020, during couple's counseling, Petitioner stated that Respondent would receive his life insurance if he died, that his son would not remember him, and "Dorona will re-create her life in the USA and find another husband."  (Ex. Z.)  Respondent responded that they are "in a loving relationship" and that she would "get[] through this no matter what, to build the best life for [their children]."  (*Id*.)  On March 8, 2021, Petitioner again stated that Respondent "need[ed] to be in the USA, to start a new life without [him]" and that hopefully his son would not remember him.  (*Id*.)  The couple reported that Respondent's parents were willing to support her return to America.  (*Id*.)  When Petitioner remarked that Respondent was leaving him, she stated that he was "putting [her and the children] first, making the ultimate sacrifice by allowing [them] to go."  (*Id*.)  Respondent also expressed her hope that her and Petitioner would reunite.  (*Id*.) ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Respondent reported the medication having a positive effect on Petitioner.  (Hearing Tr. at 343:13-25.)

On June 3, 2021, a representative from JFCS sent an email to the parties discussing next steps.  (Ex. A.)  JFCS determined that it was "agreeable to having Dorona act as the supervisor of Gadi" with the children under several conditions, including that (i) the family spend weekends with Petitioner's parents; (ii) Respondent supervise Petitioner with the children at all times; (iii) Respondent continue therapy and allow JFCS to contact her therapist on a regular basis; and (iv) JFCS approve the current living conditions and continue frequent home visits.  (*Id*.)  The family was then able to move back home.  (Ex. 15 at GB000122.)

On July 30, 2021, Petitioner's primary care provider referred him to CAMH for psychiatric consultation and diagnostic clarification as he had "recently been arrested" and "[h]is lawyer [was]

requesting [an] updated psych assessment." (Ex. J at GB000270.) The referral was not accepted, and Petitioner was not able to see a doctor. (Hearing Tr. at 251:6-9.) Petitioner eventually began working with Dr. Julien Gojer in response to the charges in January of 2022. (Ex. 15 at GB000131.) Dr. Gojer is a clinical psychologist tasked with compiling a forensic risk assessment on Petitioner, the purpose of which would assist the court in determining the likelihood of Petitioner repeating his offenses in the future. (Hearing Tr. at 88:1-21; 95:2-5; 255:1-3.) Dr. Gojer referred Petitioner for individual counseling with a registered social worker named Caroline Kerjikian. (Ex. E at GB000227.) Petitioner's sessions with Kerjikian began on December 20, 2021 and ended on April 11, 2022, with a total of 7.5 hours of counseling. (*Id.* at GB000227; GB000248; GB000235.) Petitioner then began treatment with Rob Peach, a registered social worker and sex therapist, in February of 2022. (Hearing Tr. at 78:11-25.) Petitioner was also referred to Peach by Dr. Gojer. (*Id.* at 79:1-4.) Peach's work with Petitioner "focuses on developing and understanding an awareness of his sexual thoughts, interests, and to develop strategies to help him to regulate his thoughts and urges." (*Id.* at 79:5-9.) Peach has used "standard evidence-based treatment approaches that are routinely used to treat men that have had difficulties with the law as a result of their sexual behaviors." (*Id.* at 80:10-14.) Over their nine sessions, Petitioner was entirely cooperative. (*Id.* at 82:21-22; 83:10-12.)



During the evidentiary hearing, Petitioner testified under oath that he was arrested after he was shared two unnamed links that he immediately deleted once realizing they contained child pornography.  (Hearing Tr. at 156:22–158:11; 274:18-24.)  Dr. Gojer's assessment was not yet in evidence at the time of Petitioner's testimony, and a review of Petitioner's admissions to Dr. Gojer show that this testimony was untrue.  In general, the Court found Petitioner's testimony to be evasive and unpersuasive, and the differences between Petitioner's statements in court and his admissions to Dr. Gojer call into question the veracity of his entire testimony.  As New York courts instruct, *falsus in uno, falsus in omnibus*, or "false in one thing, false in everything."

**IV.    The Separation**

On December 28, 2021, the couple got into an argument after Respondent expressed her desire to tell a friend about Petitioner's pending charges.  (Ex. F at GB000252; Ex. 15 at GB000131.)  The next morning, the argument continued, and Respondent left the house with the

children to see her sister and father who were visiting.  (*Id.*)  Petitioner began having thoughts of suicidal ideation and wanting to overdose on tequila and some zopiclone and hydromorphone. (Ex. F at GB000252.)  Instead, he called and spoke to his friend.  (*Id.*)  Petitioner then called Kerjikian for a session.  (*Id.*)  He told her that the last few days were "draining" in part because he and Respondent got into an argument the day before after she stated it was difficult to keep his court case a secret from her friends.  (Ex. E at GB000227-228.)  He also stated he had suicidal thoughts earlier that day and thought about taking sleeping pills and alcohol, but denied any intent to act on those thoughts.  (*Id.* at GB000228.)  After this discussion, Petitioner felt better and was not having suicidal ideation anymore.  (Ex. F at GB000252.)

Respondent returned to the house that evening with her sister Sara Zierler, friend, Rae Szereszewski, and Szereszewski's husband.  (Ex. 15 at GB000131.)  Petitioner would not let them into the house at first, but eventually let them in.  (*Id.*)  While waiting outside, Szereszewski called the police and told them that Petitioner was suicidal.  (Ex. F at GB000252; Ex. 15 at GB000131.) Once let inside, Respondent immediately began packing a suitcase.  (Hearing Tr. at 293:4-14.) While Petitioner testified that he placed the children's Canadian health cards in their suitcase so that they could receive health care while in the country, Respondent, her sister, and Szereszewski all testified that he also added the children's birth certificates as well.  (*Id.* at 293:4-18; 349:3-19; 428:5-15; 436:13-24.)

Around 5 p.m., Petitioner called Kerjikian back stating "his wife had just told him that she wanted to leave" and that he was "very taken aback by the news and unsure what to do."  (Ex. E at GB000228.)  She encouraged him to call a friend or the crisis line.  (*Id.*)  Kerjikian received six missed calls from Petitioner between 5:47 p.m. and 5:50 p.m. while with another client.  (*Id.*)  She eventually connected with Petitioner at 6:08 p.m., and he indicated he was with the paramedics

and police.  (*Id*.)  Kerjikian informed the police that she did not have concerns during their sessions that day but could not comment on his current state.  (*Id*.)

Petitioner was brought to CAMH by the police.  (Ex. F at GB000249.)  Petitioner informed the treatment providers that he had thoughts of suicidal ideation but was no longer having those tendencies.  (*Id*.)  He also stated that he was messaging Respondent who was not answering, and that he was concerned she may leave the country with the children as her father was leaving for the United States the next day.  (*Id*. at GB000252.)  CAMH listed Petitioner's level of suicide risk as low.  (Ex. N at GB000285.)  Petitioner was released after about three hours.  (Ex. 15 at GB000131.)

At around 9:30 p.m., Petitioner sent several text messages to Respondent that state "[c]an you at least tell me what you are planning.  Like are you going to the states tomorrow.  You can't just take the kids are [*sic*] run . . . Can I at least say goodbye . . . Please don't take them away . . . If I don't here [*sic*] from you in the morning I will call the police and tell them that you have taken the kids with out [*sic*] my permission."  (Ex. 15 at GB000132; GB000160.)  Respondent did not respond.  (*Id*.)

Petitioner had a session with Kerjikian the next morning.  (Ex. E at GB000229.)  He stated that the night before he was taken to CAMH for observation and released to his friend's home.  (*Id*.)  He also stated that Respondent told him she was leaving with the children and that he was "distraught."  (*Id*.)  He stated he "has since learned that his wife is in the United States with the children" and that he "contacted the police and [JFCS]."  (*Id*.)  Petitioner learned the children's whereabouts by tracing the Mother's cellphone location.  (Hearing Tr. at 131:13-17; 174:5-8.)

On January 6, 2022, the couple had a mediation session with Hovanessian.  (Ex. Z.)  The counselor notes that Respondent "left for the USA taking their children, according to [Petitioner]

without his consent." (*Id*.)  Petitioner reported feeling "blindsided" and that he wanted to talk it through.  (*Id*.)  Respondent stated she was surprised he was so shocked, and that she hit her limit. (*Id*.)  Petitioner continued that Respondent "left without telling [him]" and "made the decision without [him]."  (*Id*.)

On January 21, 2022[2], JFCS sent a letter to the couple advising that it would be closing the family's file as "child protection concerns are mitigated due to the mother no longer residing in Canada at this time therefore the father is not having in-person access visits with his children" and therefore "the children are no longer in need of protection."  (Ex. 13.)  JFCS recommended that if the children were to return or have access to the Father without supervision, that it be contacted immediately to access risk.  (*Id*.)  JFCS also continued to recommend that "the [F]ather not participate in unsupervised access and that the [M]other maintain her full supervision of the children with the [F]ather or a third party that understands the concerns and level of supervision required."  (*Id*.)  This same day, Petitioner's parents were made his sureties.  (Ex. 12.)  Petitioner moved back in with his parents on February 3, 2022.  (Ex. 14; Ex. 15 at GB000123.)

On February 15, 2022, Petitioner filed requests for Return of Child pursuant to the Hague Convention.  (Ex. 4.)  On March 1, 2022, Respondent's attorney emailed Petitioner's representative stating that Respondent was currently visiting her parents with the children, but would like to be able to relocate with the children to continue receiving their help.  (Ex. 15 at GB000168.)  Respondent testified that the children have adjusted to life in New York, with Child 1 accepted to a new school and making new friends, and Child 2 enjoying having more space and time with extended family.  (Hearing Tr. at 353:4-12.)  Petitioner has not provided Respondent any money for the children since they left Canada.  (*Id*. at 359:10-18.)

---

[2] The parties agreed that the date on the letter is a typo.  (Hearing Tr. at 148:21-23.)

On March 8, 2022, Petitioner filed an action in the Superior Court of Justice in Ontario requesting an order for the immediate return of the children, as well as a divorce, support for children, decision-making responsibility, parenting time, and contact with children.  (Ex. 15 at GB000119-120.)  Petitioner requested an order that the children reside with him and his parents. (*Id*. at GB000120.)  On March 21, 2022 the Superior Court directed Respondent to ensure that the children have zoom calls with Petitioner at least three times per week.  (Ex. Y at Ex. E.)  The action has since been stayed.  (Ex. 15 at GB000212.)

On May 16, 2022, the Family Court of the State of New York, Sullivan County issued a temporary order of protection directing Petitioner to stay away from Respondent and the children, and to refrain from communication or any other contact with Respondent and the children except for his zoom calls three times per week.  (Ex. Y at Ex. G.)

## V.    Procedural History

On May 5, 2022, Petitioner filed a Petition for Return of Children to Canada pursuant to the Hague Convention and ICARA.  (ECF No. 5.)  On May 6, 2022, the Court prohibited the parties from removing the children from this jurisdiction pending final disposition of this matter, and ordered the Mother to surrender passports, identity cards, visas, and other travel documents for the children to her attorney.  (ECF No. 12.)  Respondent filed a response to the Petition on May 25, 2022.  (ECF No. 22.)  The Court conducted a three-day evidentiary hearing beginning on July 11, 2022.

## <u>LEGAL STANDARD</u>

The Hague Convention "seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  *Abbott v.*

*Abbott*, 560 U.S. 1, 8 (2010).  The United States is a Contracting State to the Hague Convention, which has been implemented through ICARA.  *Id*. at 9.  The central remedy under the Hague Convention is the return of the child to his or her habitual residence.  *Id*.  "When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply."  *Id*. (quoting Hague Convention, Arts. 4, 12.)  "Any person seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action . . . ."  22 USCS § 9003(b).

> The Hague Convention provides that
>
> [t]he removal or the retention of the child is to be considered wrongful where (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Abbott*, 560 U.S. at 8 (quoting Hague Convention, art. 3).  Therefore, to establish a *prima facie* case of wrongful retention under the Hague Convention, a petitioner must demonstrate by a preponderance of the evidence that

> (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005).  Once a petitioner establishes a *prima facie* case, the child must be returned to the place of habitual residence unless "one of the affirmative defenses set forth in Articles 12, 13, and 20 applies."  *Cruvinel v. Cruvinel*, No. 19-CV-4237 (LDH) (SIL), 2022 WL 757955, at *5 (E.D.N.Y. Jan. 10, 2022).

## DISCUSSION

Respondent has conceded that Petitioner has established his *prima facie* case. (Respondent's Post-Trial Brief ("Respondent's Brief") ECF No. 46 at 20.)  Therefore, the only remaining issue before the Court is whether one of the Hague Convention's enumerated exceptions applies that would prevent return of the children.  Respondent argues two of the exceptions apply: consent and grave risk of harm.  (*Id*.)  The Court will evaluate both below.

### I.      Consent

Respondent avers that Petitioner consented to Respondent removing the children to the United States.  (Respondent's Brief at 35-37.)  Article 13 of the Hague Convention provides that "the judicial or administrative authority of the requested State is not bound to order the return of the child if . . . the person . . . having the care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention."  Hague Convention, art. 13(a).  To establish this defense, the respondent must show by a preponderance of the evidence that the petitioner consented to the removal or retention.  *Velozny v. Velozny*, 550 F. Supp. 3d 4, 15 (S.D.N.Y. 2021). The consent does not have to be formal, instead the Court must analyze the petitioner's conduct prior to the removal or retention, and "consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country."  *Id*. (citing *Berenguela-Alvarado v. Castanos*, 950 F.3d 1352, 1359 (11th Cir. 2020); *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)).  "The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent."  *In re Kim*, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005).

Here, Respondent has failed to prove by a preponderance of the evidence that Petitioner consented to Respondent taking the two children to New York on December 29, 2021.  The parties do not dispute that on the day of the separation, the Mother left with the two children and did not

tell Petitioner where they were going.  Petitioner called and texted the Mother, who refused to answer.  Specifically, that evening, Petitioner texted the Mother asking what she was planning and whether she was going to the United States, and begging her not to take the children away.  *See Padilla v. Troxell*, 850 F.3d 168, 176 (4th Cir. 2017) ("[A] petitioner's conduct *after* removal can further inform whether [he or] she consented at the time of removal.") (emphasis in original); *Chumachenko v. Belan*, No. 18-CV-9728-LTS, 2018 WL 6437062, at *8 (S.D.N.Y. Dec. 7, 2018) (holding the respondent failed to prove that the consent defense applied where "Respondent's departure to the United States was immediately followed by contemporaneous text messages from Petitioner protesting Respondent's actions, lamenting his unilateral decision to take the Children away from her, and refusing to write a letter allowing the Children to live with Respondent"). Further, the notes from both Kerjikian and Hovanessian reflect that Petitioner did not know the children would be taken to New York.  Petitioner told Kerjikian the next morning that he was "distraught" and that he had contacted the police.  In addition, during the mediation session with Hovanessian, Petitioner stated he was "blindsided", and that Respondent made this decision without him.

While the parties had discussions about the Mother and children going to live with her parents in New York after Petitioner's arrest, these discussions do not indicate Petitioner provided consent to their removal at the time of the separation.  *See Velozny*, 550 F. Supp. 3d at 16–17 (holding the petitioner did not consent to removal where emails showed the petitioner discussed receiving assistance from his father-in-law in New York but eventually rejected the idea of sending the children there); *Laguna v. Avila*, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *7 (E.D.N.Y. May 7, 2008) (holding that the parties' custody agreement that stated that after returning to Colombia the child could move to the United States if he so desired was insufficient to establish

the petitioner consented to retention of the child in the United States).  Further, there is no evidence that these discussions occurred anytime after March 2021, around the same time the Father began his medication, a medication that both parties indicated helped his depression.

While the Mother provided testimony showing that Petitioner gave her the children's birth certificates before they left the house, this, without more, is insufficient to establish Petitioner's subjective consent to her taking the children to live in New York.  *See Kosewski v. Michalowska*, No. 15-CV-928 (KAM)(VVP), 2015 U.S. Dist. LEXIS 139924, at *44–45 (E.D.N.Y. Oct. 14, 2015) (denying consent defense where the record established that petitioner accompanied respondent to a passport office after she requested that he consent to the child obtaining a passport, but the parties disputed whether respondent told petitioner that she planned to move to the United States with the child prior to petitioner's agreement); *In re J.J.L.-P.*, 256 S.W.3d 363, 375 (Tex. App.—San Antonio 2008, no pet.) (upholding denial of the consent defense where the petitioner surrendered the child's travel documents to the respondents because petitioner testified that he surrendered the documents to permit the child to enter the country for the holidays only).

Accordingly, the Court holds that Respondent has failed to prove by a preponderance of the evidence that Petitioner consented to the children's removal and retention.

## II.    Grave Risk

Petitioner next avers that there is a grave risk that returning the children to Canada would expose them to harm.  (Respondent's Brief at 20-35.)  Article 13 of the Hague Convention prevents the Court from ordering the return of a child when "his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b).  "The potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high."  *Abdollah*

*Naghash Souratgar v. Fair*, 720 F.3d 96, 103 (2d Cir. 2013).  The respondent bears the burden of establishing the defense by clear and convincing evidence.  *See* 22 U.S.C. § 9003(e)(2)(A).

The defense requires a real risk of the child being harmed, as the Second Circuit has explained:

> at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation.  The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001).

Here, Respondent argues that the record has established "Petitioner's unstable mental health and demonstrated history of engaging in dangerous and illegal activities" and that this creates a probability of grave harm and an extreme magnitude of harm.  (Respondent's Brief at 22.)  Specifically, Respondent avers that Petitioner's untreated mental health issues, history of domestic violence and coercive conduct, and access and possession of child pornography together demonstrate a grave risk of harm to the children.  (*Id*. at 20-27.)  The Court agrees.

The record reflects an existence of factors in combination that create a grave risk of harm if the children were returned to Canada.  First, Petitioner has a long and serious history of untreated mental health issues.  Petitioner has had suicidal ideation and attempts since the age of ten.  He has attempted suicide three times, including once when Child 1 was asleep in the house.  Petitioner was diagnosed with BPD in 2020, but did not answer in the affirmative when asked if he accepts his diagnosis.  He was not prescribed medication until March of 2021, and has been unable to begin the treatment needed for BPD.  While he acknowledges a need for treatment and to unpack past traumas, Petitioner has had an unstable history of treatment, and only recently began working with a psychiatrist in response to his criminal charges.

Respondent presented testimony from Dr. Elizabeth Jeglic, a clinical psychologist and professor, who testified that DBT is an intense behavioral treatment for those with BPD and repeated suicide attempts, which typically takes years to become effective. (Hearing Tr. at 214:9-14; 217:2-12.)   Without this therapy, BPD symptoms including self-harming, suicide, and emotional instability, would continue.   (*Id*. at 217:13-23.)   Further, Dr. Jeglic discussed the intergenerational suicide risk which states that a parent who attempts suicide increases the risk of their children engaging in suicidal behavior.   (*Id*. at 203:6-25.)[3]   There is no doubt that exposing the children to suicidal behavior would create a real risk of psychological harm.

Second, Petitioner has a concerning history of angry and manipulative behavior.   He has threatened to commit suicide, hit and shoved Respondent out of anger, continued play fights with both Respondent and Child 1 when asked to stop due to pain, and strangled Respondent to the point of almost passing out.   Petitioner also has intense, angry reactions when the Mother merely brings up discussing him with others, including her therapist.   While most of this behavior was directed at the Mother, "evidence of prior spousal abuse, though not directed at the child, can support the grave risk of harm defense." *Davies v. Davies*, 717 F. App'x 43, 47–48 (2d Cir. 2017) (upholding the district court's finding that the grave risk of harm defense applied as the petitioner had a history of "pervasive, manipulative violence" that consisted of psychological abuse).   This is particularly concerning now, as the Mother has discussed Petitioner's mental health issues and criminal charges with a full range of people, including her family, friends, and the Court.

Third, and perhaps most important, is the Petitioner's arrest for access and possession of child pornography. ██████████████████████████████████████ ██ and has discussed having sexual fantasies involving children.   While she did not examine

---

[3] There was no objection to Dr. Jeglic opining on this issue.

Petitioner, Dr. Jeglic testified that those who possess child pornography are at an increased of risk of contact sexual abuse.  (Hearing Tr. at 196:11-23.)  Further, ███████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  Therefore, it

appears that Dr. Gojer has established that without treatment, Petitioner does create a risk to children.  *See M.M v. F.R*, No. 11 Civ. 2355 (PKC), 2011 U.S. Dist. LEXIS 156760, at *26 (S.D.N.Y. June 30, 2011) (holding a grave risk of harm existed where eight years prior the petitioner engaged in sexual abuse of a child and had since had a "lack of a meaningful and continuing regimen of rehabilitation").  Further, while the children are too young to understand what is happening now, Child 1 will soon be at an age where he will start to question what is happening to his family.  The "derivative harm" of Child 1 eventually learning about his Father's actions could prove to be "psychologically devastating."  *Id*. at *23–24 (discussing how it could be "psychologically devastating" for the child to learn that his father sexually abused his half-sister).

Petitioner cites to *Kufner v. Kufner,* 480 F. Supp. 2d 491 (D.R.I. 2007), to support his argument that the exception does not apply.  (Petitioner's Post-Evidentiary Hearing Brief ("Petitioner's Brief") ECF No. 45 at 10.)  In that case, the respondent alleged that the petitioner "engaged the children in a photo session disguised to create child pornography; [] the children [felt] abused by this . . . ; and . . . the German courts and child welfare agencies [were] incompetent or otherwise unable to see what [she] perceive[d] as an obviously harmful situation."  *Id*. at 509.

However, the court found an "overwhelming absence of any evidence suggesting the children were subjected to sexual abuse, or, if returned, [would] be abused." *Id*. The court appointed an independent expert in pediatrics, child abuse, child sexual abuse, and child pornography to offer her expert opinion on the respondent's arguments. *Id*. at 503. The expert explicitly rejected the conclusion that the photographs could be considered child pornography or that the petitioner took them in an effort to create child pornography and stated that the symptoms displayed by the children were not due to sexual abuse. *Id*. at 510–11. In addition, there was a complete absence of any evidence suggesting that the petitioner was a pedophile. *Id*. at 510. As the court agreed with the expert, and as the respondent failed to produce any evidence to the contrary, the court held that the grave risk exception did not apply. *Id*. at 510–11. *Kufner* is clearly distinguishable from the facts presented here, as Petitioner ███████████████, and has admitted to watching child pornography and having sexual fantasies involving children.

In addition,

> the Second Circuit has not ruled out "the possibility of a case in which a petition seeking a child's return [was] filed less than a year after the child's abduction, but it [was] nevertheless established 'by clear and convincing evidence' on the child's behalf that . . . she [or he] is so deeply rooted in the United States that 'there is a grave risk that [the child's] return would expose the child to . . . psychological harm.'"

*Cruvinel*, 2022 WL 757955, at *7 (quoting *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 406 (E.D.N.Y 2005)); *see also Porretti v. Baez,* No. 19-CV-1955, 2019 WL 5587151, at * (E.D.N.Y. Oct. 30, 2019) (holding that where a child is "well-settled, . . . the stress and psychological impact of returning" may be "multiplied"). Here, the children have been in the United States for over seven months, and according to the Mother they have adjusted to life in New York. Child 1 is going to school and has made friends, and both children enjoy spending time with extended family members. In addition, the Mother and children no longer have a place to live in Canada, and the

Mother has no money or job in Canada.  (Hearing Tr. at 421:14-22.)  Therefore, returning the children to Canada would likely cause confusion, and would expose them to additional psychological harm.

Lastly, Petitioner states that he has consented to eight ameliorative measures if this Court orders the children return to Canada, including (i) JFCS is notified in advance of the return date of the children to Canada; (ii) Petitioner continues to comply with all surety conditions; (iii) Petitioner has no contact with Respondent upon her return to Canada; (iv) Petitioner continues to undergo therapy with Peach; (v) Petitioner continues to take his Sertraline prescription; (vi) Petitioner commences DBT with Peach; (viii) Petitioner continues to reside with his parents; and (viii) Petitioner continues to comply with all JFCS conditions and requirements.  (Petitioner's Brief at 14-15.)

In considering ameliorative measures, the Court must (1) "prioritize the child's physical and psychological safety"; (2) "abide by the Convention's requirement that courts addressing return petitions do not usurp the role of the court that will adjudicate the underlying custody dispute"; and (3) "accord with the Convention's requirement that courts act expeditiously in proceedings for the return of children." *Golan v. Saada*, 142 S. Ct. 1880, 1893–94 (2022).

Here, the Court does not find that these ameliorative measures would prioritize the children's physical and psychological safety.  First, none of the measures adequately address Petitioner's lack of serious mental health treatment.  While he has agreed to continue taking Sertraline and undergoing therapy with Peach, neither of these treatments would address his BPD. In addition, Peach testified that he is a registered social worker and sex therapist, the Court has not been presented any evidence that he is qualified to provide such an intense and long-lasting kind of therapy like DBT.  In fact, when asked if he was treating Petitioner for BPD, Peach stated, "I

do not provide treatment exclusively for borderline personality disorder" and "I'm not someone that has expertise in treating borderline personality disorder directly." (Hearing Tr. at 97:12-9; 108:79.)

Second, none of the proposed measures address Petitioner's history of aggressive behavior and coercive control. While he agrees to continue therapy with Peach, Peach testified that his treatment "focuses on developing and understanding an awareness of his sexual thoughts, interests, and to develop strategies to help him to regulate his thoughts and urges." (Hearing Tr. 79:5-9.) This does not impact Petitioner's alleged anger and manipulation issues. Lastly, none of the measures adequately protect the children from Petitioner's pedophilia. While Petitioner states he would comply with the surety conditions and any instructions from JFCS, there is evidence in the record that he has already failed to do so. Petitioner's bail conditions state that he cannot possess any device capable of accessing the internet or social media except in the presence of his sureties. (Ex. 12.) However, his father testified that he has access to a tablet, Respondent testified that he used electronics when she was not present, and Peach testified that Petitioner is still viewing pornography. (Hearing Tr. at 111:13-15; 138:24–139:22; 381:25–382:1.) Petitioner himself also testified that he currently has access to pornography on his device, and he uses a platform to speak to adults and meet in person. (*Id*. at 160:22-25.) Therefore, the Court is not convinced that Petitioner would now be motivated to abide by the conditions.

Accordingly, taking all of these factors together, the Court holds that Respondent has established the grave risk of harm defense.

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner's request for relief under the Hague Convention is DENIED.   The Petition is dismissed, and each party shall bear its own costs.   The Court's prohibition on the removal of the children from this district during the pendency of this action is hereby lifted.   The Clerk of Court is respectfully directed to enter judgment in favor of Respondent, and close this case.

Dated: July 29, 2022                                    SO ORDERED:

White Plains, New York

_____

NELSON S. ROMÁN

United States District Judge